**Robert ELMORE, Petitioner-Appellee,**

v.

**Dale FOLTZ, Respondent-Appellant.**

. No. 84–1784.

United States Court of Appeals,
Sixth Circuit.

Argued June 11, 1985.
Decided July 26, 1985.

**774**

Frank J. Kelley, Thomas C. Nelson (argued), Lansing, Mich., for respondent-appellant.

David M. Lawson (argued), Detroit, Mich., for petitioner-appellee.

Before KENNEDY and MILBURN, Circuit Judges, and RUBIN, Chief District Judge.[*]

CORNELIA G. KENNEDY, Circuit Judge.

The State of Michigan appeals from the decision of the District Court conditionally granting Elmore's petition for a writ of habeas corpus.

Elmore filed his petition under 28 U.S.C. § 2254 on May 12, 1981, alleging that his 1977 state conviction for delivery of a controlled substance was unlawful on five separate grounds. The District Court's dismissal of three of the grounds on summary judgment was not appealed. The two remaining grounds, that Elmore had been denied effective assistance of counsel and that the prosecution had unconstitutionally suppressed exculpatory evidence, were referred to a magistrate for an evidentiary hearing. The District Court then granted the petition on the ground that, under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Elmore's right to due process had been violated by the prosecution's suppression of exculpatory evidence. The state appeals, arguing that the District Court misapplied *Brady*, and that, in any event, Elmore did not exhaust his state remedies before seeking federal relief.

Elmore's conviction stemmed from an April 22, 1977 transaction between him and one Cagle, who was working with the police as a confidential informant. Elmore allegedly sold heroin to Cagle on that date, and on several other occasions as well. At many of these meetings, Cagle was wired for audio transmission. These transactions were monitored by nearby police officers and taped on a recorder carried by Cagle. The magistrate found that no tape was made of the April 22 transaction or any transaction with Cagle before that date.

At trial, Elmore testified that he never sold heroin to Cagle, but that he merely returned to Cagle heroin which belonged to Cagle and which Elmore had been storing for him. Elmore argues that tapes of any of the transactions would have confirmed this, thus supporting Elmore's testimony and casting doubt upon Cagle's. The state, however, did not produce any tapes, apparently thinking that only a tape of the April 22 transaction would be relevant, and no such tape existed. The magistrate found that, after Elmore's conviction, the existing tapes were erased for budgetary reasons, without any bad faith on the part of the prosecutor or the state.

After filing an appeal with the Michigan Court of Appeals, but before the merits of the appeal were briefed or argued, Elmore filed in the court of appeals a motion to remand to the trial court in order to create a testimonial record on the issue of whether the prosecution had suppressed exculpatory evidence. That issue, according to Elmore's motion, encompassed inquiry into possible ineffective assistance of counsel, based on a failure to pursue the potentially exculpatory evidence. The court of appeals denied the motion, citing a "lack of merit in the grounds presented." Under former Michigan General Court Rule 853.2(4), Elmore could have immediately appealed the denial of that motion to the Michigan Supreme Court, but he did not. Nor did he raise the suppression issue or ineffective

* Honorable Carl B. Rubin, United States District Court for the Southern District of Ohio, sitting by designation.

assistance issue in his brief on the merits before the court of appeals. That court affirmed his conviction.

Elmore then submitted a letter to the Michigan Supreme Court asking it to review his case. This procedure accorded with Administrative Order 1977–4, 400 Mich. lxvii (1977), which allowed indigent inmates to request, by letter, supreme court review of "the decision in my case ... together with the Court of Appeals record and the trial court record, to determine whether leave to appeal or other relief should be granted." By order of November 19, 1980, the supreme court declined to grant any relief to Elmore.

■ The exhaustion doctrine, in the context of habeas corpus relief, requires the habeas petitioner to fairly present to the state courts the substance of his federal claim. *See Anderson v. Harless,* 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982). The state characterizes Elmore's court of appeals motion to remand—the only place the relevant issues were explicitly raised in the state courts—as a procedural device which does not require a decision on the merits. Therefore, the state argues, Elmore never really presented the substance of his claim to the Michigan Court of Appeals, and certainly not to the Michigan Supreme Court.

■ We disagree. During the time the Michigan Court of Appeals had jurisdiction of Elmore's case, the only procedure by which he could have secured review of his present constitutional claims was to have the case remanded to the trial court for development of a factual record. No one disputes that his motion to remand was proper under former Michigan General Court Rule 817.6. After that motion was denied, however, Elmore could not raise his new claims in his brief on the merits since subsequent decision of those issues on an inadequate record would have been error. *See People v. Garn,* 414 Mich. 859, 322 N.W.2d 174 (1982). Given that Elmore's motion to remand was a procedurally proper approach to securing review of the issues, given the length and detail of that motion, and given the denial of the motion

for "lack of merit," we cannot say that Elmore failed to fairly present his constitutional claims to the Michigan Court of Appeals.

■ Although it is less clear, we hold that Elmore also sufficiently presented his claims to the Michigan Supreme Court. We have previously held that filing a letter pursuant to Michigan Administrative Order 1977–4 is sufficient to satisfy the exhaustion requirement. *See Jones v. Foltz,* 646 F.2d 1172 (6th Cir.1981); *see also Hill v. Anderson,* 492 F.Supp. 930 (E.D.Mich. 1980). In *Jones,* we adopted the reasoning of Judge Joiner's opinion in *Hill:*

> The Michigan Supreme Court, by the terms of Administrative Order No. 1977–4, has made an unqualified commitment to review, in every letter request proceeding, the Court of Appeals' decision and *the record of the Court of Appeals* and of the trial court to determine whether leave to appeal or other relief should be afforded the defendant. Review of the record of the Court of Appeals necessarily includes consideration of all issues raised by the defendant to the Court of Appeals; indeed, when a defendant chooses to proceed by letter request, it seems obvious that the Supreme Court will necessarily rely on the Court of Appeals briefs and decision for purposes of identifying the defendant's specific claims of error. For this reason, it is the opinion of the court that a defendant who has filed a "letter request" with the Michigan Supreme Court must be considered to have presented to that Court all those issues which he raised to the Michigan Court of Appeals.

492 F.Supp. at 932 (emphasis added). The instant case differs from *Jones* and *Hill* in that the issues in question were not raised in Elmore's brief on appeal, but only in his motion to remand. They were, therefore, undeniably more obscure than the issues raised in *Jones* and *Hill;* nevertheless, they were a part of the record of the Michigan Court of Appeals, and we believe they

fell within the scope of Michigan Supreme Court "letter request" review.

 The state points out that Elmore could still seek relief by filing a motion for a new trial, pursuant to Mich.Comp.Laws Ann. § 770.2(4). That is true, but irrelevant. Once an issue has been presented to the state's highest court, exhaustion "does not require future repetitive presentations to such court by additional attempts through a variety of successive motions." *Duke v. Wingo,* 386 F.2d 304 (6th Cir.1967); *see also Keener v. Ridenour,* 594 F.2d 581 (6th Cir.1979). Since we hold that Elmore has presented his claims to Michigan's highest court, he is not required to pursue other available state remedies. We therefore turn to Elmore's due process claim.

In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1968), the Supreme Court held that

the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution.

*Id.* at 87, 83 S.Ct. at 1196.

The record of the evidentiary hearing before the magistrate reflects confused and conflicting versions of what actually transpired with respect to the requests for the Elmore-Cagle tapes.[1] We must accept the factual determinations of the District Court, however, and, to the extent the District Court neither expressly nor implicitly rejected the magistrate's factual determinations, we also accept those. The relevant facts, as found below, are that there were no tapes made of the transaction on which petitioner was convicted, only tapes of subsequent transactions;[2] that Elmore's counsel joined in another counsel's motions for production of all tapes, which the prosecutor apparently construed as a request limited to tapes of transactions on the dates charged;[3] and that there was no bad faith on the part of the prosecutor in not producing the tapes.[4]

Although the court stated that the petitioner was prejudiced by the prosecutor's "suppression" and destruction of the tapes, it did not make any finding with respect to when counsel for Elmore knew of the existence of the tapes. Daly, Elmore's counsel, testified:

A I recall talking to both Mr. Koselka and to Detective Irish about there being the existence of some tapes.

\* \* \* \* \* \*

A I remember Mr. Koselka telling me that a tape existed. I can't remember when he told me that.

\* \* \* \* \* \*

A I believe it was somewhere during the trials. I remember specifically asking about tapes for the charges.

App. at 351.

Q Now, did you ever make a request to listen to the tapes?

A Yes.

Q Were you denied?

A I was told there was no tapes of the—the tapes that I'd wanted to listen to were any tapes involved in the actual transaction that we were going to trial on.

Q Were you told there were tapes of other transactions?

A Yes.

Q Did you ever ask to listen to those?

A No.

Q Did you ever ask that those tapes be produced?

A No.

App. at 354–55.

---

1. The parties vigorously dispute three issues: the point in time at which Elmore's trial counsel, Daly, became aware of the existence of tapes; whether Daly in fact ever requested the tapes; and whether the prosecution ever attempted to mislead the court or counsel with respect to the existence of the tapes.

2. *See* Magistrate's Report and Recommendation (MRR) at 6 n. 6; MRR at 9 n. 8.

3. See MRR at 5 & n. 5; Memorandum Opinion of the District Court at 3.

4. *See* MRR at 6 n. 7.

The magistrate appears to have concluded that Daly knew of the tapes before or during the trial since he states that it appears that Daly's decision not to pursue the tapes more vigorously was tactical.[5] If Elmore's counsel knew of the tapes before or during the trial and did not seek to listen to them, a finding that they were suppressed would be clearly erroneous. In view of our disposition of the matter, however, it is not necessary to remand the case to the District Court for a finding as to when Elmore's counsel knew of the existence of the tapes.

■ To find a *Brady* violation, not only must the evidence be suppressed, we must also find that the suppressed evidence was material (in this case to the question of guilt) and that it was favorable to the accused. Were the evidence in our hands to examine, we could apply the materiality standards set forth in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). *Agurs*, however, provides no guidance to a court which faces the "treacherous task of divining the import of materials whose contents is unknown and ... disputed." *California v. Trombetta*, — U.S. —, 104 S.Ct. 2528, 2533, 81 L.Ed.2d 413 (1984). Fortunately, *Trombetta* does for unknowable evidence what *Agurs* did for knowable evidence, and it thus guides our attempt to assess the significance of the destroyed Elmore-Cagle tapes.

In *Trombetta*, the Court considered whether due process requires "that the State preserve potentially exculpatory evidence on behalf of defendants." — U.S. at —, 104 S.Ct. at 2530. Defendants in *Trombetta* were charged with drunk driving. They moved to suppress the results of an "Intoxilyzer" test—used to measure blood-alcohol content—on the ground that the officers did not preserve defendants' breath samples, a technically feasible feat. Defendants claimed that they could have used the breath samples at trial to impeach the Intoxilyzer test results.

In rejecting defendants' claim, the Court began by pointing out that the police had not destroyed the breath samples "in a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* and its progeny." 104 S.Ct. at 2534. The Court then announced a two-part test for evaluating the materiality of destroyed evidence:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, see *United States v. Agurs*, 427 U.S., at 109–110 [96 S.Ct., at 2400–2401] evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.* (footnote omitted).

In applying this test, the Court reasoned that the Intoxilyzer's general reliability was reason enough to conclude that preserved breath samples would probably not have been exculpatory. As to the nature of the evidence, the Court determined that defendants could reasonably have obtained comparable evidence: data on possible sources of mechanical error could have been used to impeach the Intoxilyzer's reliability and, with respect to possible human error, the defendants retained "the right to cross-examine the law enforcement officer who administered the Intoxilyzer test, and to attempt to raise doubts in the mind of the fact-finder whether the test was properly administered." 104 S.Ct. at 2535 (footnote omitted).

We are unable to distinguish *Trombetta* from the instant case in any significant way. First, the magistrate found that there was no bad faith in the state's destruction of the tapes. Second, the chances

5. *See* MRR at 14.

**778**

that the tapes would have proved exculpatory are negligible. Other than the conflicting testimony of Elmore and Cagle, the only evidence about the contents of the tapes was the report of Officer Fogarty, who monitored the taped transactions as they occurred. His report supports Cagle's version of events. We also think it borders on the preposterous to suppose that Cagle, with a tape recorder on his person, would behave as Elmore suggests he did and thereby inculpate himself.

Third, just as the defendants in *Trombetta* could attempt to raise doubts in the mind of the fact-finder by calling into question the reliability of the test or the competence of the administering officer, Elmore was free to try to raise doubts about Cagle's reliability. Obviously, no better tool exists for impeaching Cagle than a tape directly contradicting him. But neither does a better tool exist for impeaching the Intoxilyzer than a breath sample contradicting its results. Under *Trombetta*, though, all that matters is that some reasonable alternative means exists for attempting to do what one would have attempted to do with the destroyed evidence. Elmore might have cast aspersions upon Cagle's reliability in any number of ways; the tapes were not indispensable to that effort.

The destruction of the Elmore-Cagle tapes did not constitute a due process violation. The judgment of the District Court is reversed and the case is remanded for a determination of Elmore's ineffective assistance of counsel claim.